UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

—————————————————————————— x

BRIAN FORD, Individually and on Behalf of :    Civil Action No.
All Others Similarly Situated, : 

                 :    COMPLAINT FOR VIOLATIONS OF THE

          Plaintiff, :    FEDERAL SECURITIES LAWS

                 :

    vs. :

                 :

VOXX INTERNATIONAL CORPORATION, :    <u>DEMAND FOR JURY TRIAL</u>
PATRICK M. LAVELLE and CHARLES :
MICHAEL STOEHR, :

                 :

          Defendants. :

                 :

—————————————————————————— x

Plaintiff has alleged the following based upon the investigation of Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by VOXX International Corporation ("VOXX" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of purchasers of the common stock of VOXX between May 15, 2013 and May 14, 2014, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

4.      Venue is proper pursuant to §27 of the Exchange Act, as many of the acts and conduct complained of herein occurred in this District and the Company is headquartered in this District.

5.      In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6.      Plaintiff Brian Ford, as set forth in the accompanying certification, incorporated by reference herein, purchased the common stock of VOXX during the Class Period and has been damaged thereby.

7.      Defendant VOXX, together with its subsidiaries, operates as a manufacturer and distributor in the automotive, premium audio, and consumer accessories industries in the United States and internationally.

8.      (a)      Defendant Patrick M. Lavelle ("Lavelle") is, and was at all relevant times, the Company's Chief Executive Officer ("CEO"), President and a member of its Board of Directors.

(b)      Defendant Charles Michael Stoehr ("Stoehr") is, and was at all relevant times, the Company's Chief Financial Officer ("CFO"), Senior Vice President and a member of its Board of Directors.

(c)      Defendants Lavelle and Stoehr are collectively referred to herein as the "Individual Defendants."

9.      Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

10.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the

- 2 -

narrowly defined group of Defendants identified above.  Each of the above officers of VOXX, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein.  Said Defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

11.    As officers and controlling persons of a publicly-held company whose shares were, and are, registered with the SEC pursuant to the Exchange Act, and were, and are, traded over The NASDAQ Stock Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of VOXX publicly-traded shares would be based upon truthful and accurate information.  The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

12.    The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of

their Board membership and/or executive and managerial positions with VOXX, each of the Individual Defendants had access to the adverse undisclosed information about VOXX's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about VOXX and its business issued or adopted by the Company materially false and misleading.

13.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

14.     Each of the Defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of VOXX common stock by disseminating materially false and misleading statements and/or concealing material adverse facts.  The scheme: (i) deceived the investing public regarding VOXX's business, operations, management and the intrinsic value of VOXX common stock; (ii) enabled certain Company insiders to collectively sell 594,954 shares of their personally-held VOXX common stock for gross proceeds in excess of $7.5 million; and (iii) caused Plaintiff and other members of the Class to purchase VOXX common stock at artificially inflated prices.

## CLASS ACTION ALLEGATIONS

15.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all those who purchased the common

stock of VOXX between May 15, 2013 and May 14, 2014, inclusive, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants and their families, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

16.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, VOXX common stock was actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are hundreds, if not thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by VOXX or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

17.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

18.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class action and securities litigation.

19.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)     whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of VOXX;

(c)     whether the price of VOXX common stock was artificially inflated during the Class Period; and

(d)     to what extent the members of the Class have sustained damages and the proper measure of damages.

20.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

21.     The Company describes itself as a "leading international manufacturer and distributor in the Automotive, Premium Audio and Consumer Accessories industries."

22.     The Company operates in three different segments: (a) Automotive, which includes rear seat entertainment systems, satellite radio products, remote start systems, digital TV tuners, mobile antennas, and other multi-media applications.  Some of the Company's brands in this segment include Jensen®, Advent®, Audiovox®, Mac Audio®, Code Alarm®, InVision®, and Hirschmann; (b) Premium Audio, which includes home theater systems, high-end loudspeakers, outdoor speakers, sound bars, sound bases and headphones.  Some of the Company's brands in this segment include Klipsch®, Jamo®, Energy®, Heco® and Magnat®; and (c) Consumer Accessories, which includes universal remote controls, reception products, indoor Bluetooth speakers, outdoor iPod docks, and other connectivity and charging applications.  Some of the Company's brands in this segment include RCA, Acoustic Research, Terk®, Audiovox®, Schwaiger® and Oehlbach®.

23.     In total, the Company has over a portfolio of over 30 brands, and an international footprint in Europe, Asia, Mexico and South America.

24.     In November 2007, VOXX acquired all of the outstanding stock of Technuity, Inc., a player in the battery and power products industry and the exclusive licensee of the Energizer brand in North America for a total purchase price of $20.4 million. As part of this transaction, VOXX acquired the rights to market Energizer's line of rechargeable batteries and battery packs for camcorders, cordless phones, digital cameras, DVD players and other power supply devices.  With regard to the acquisition, Defendant Lavelle stated, in pertinent part:

> This latest acquisition will further strengthen our accessories product lines and core offerings to our customers.  Energizer's highly recognized consumer brands - Energizer, known for the 'Energizer Bunny' and Eveready brand - hold the top two market positions in every category in which it competes and coupled with our previous acquisitions of Terk, RCA and Oehlbach, make Audiovox a significant player in the accessories market.

> We expect this deal to add in excess of $30 million to our annual sales and at higher margins than our core business.  This business is growing and will be accretive to our bottom line.  We intend to continue to pursue strategic acquisitions within our core competencies that can generate higher and sustainable returns for our shareholders over the long-term.

25.     Additionally, in March 2008, VOXX built upon this acquisition by acquiring the licensing rights to market and distribute Energizer-branded products (rechargeable power packs and other power related accessories) throughout Mexico, Central America, the Caribbean and South America, excluding select locations.  Defendant Lavelle stated, in pertinent part:

> When we acquired Technuity in late 2007, it was our goal to integrate the powerful Energizer brand in our core accessory businesses and use it to expand our international distribution. Today's announcement takes us in that direction as we add Mexico, the Caribbean, Central and most of South America to the distribution network for our power products.  We are confident that our global initiatives will positively impact both our top and bottom-line performance, enhance our customer offerings globally and maximize value for our shareholders.

26.     In February 2010, the Company completed the acquisition of the assets of Invision Industries, Inc., a manufacturer of rear seat entertainment systems to Original Equipment Manufacturers ("OEMs"), ports and car dealers for a total cash purchase price of $10.3 million. With regard to the acquisition, Defendants Lavelle stated, in pertinent part:

> One of the strengths of Invision and one of the elements that made them a particularly attractive acquisition was their history of strong relationships with some of the world's leading car makers.  As a result of this acquisition we believe we will enhance our position as a significant supplier to the OE market by adding increased R&D capabilities, a manufacturing facility and an established support team to augment our own OE group.

> We expect to take full advantage of the improvements in the automotive sector that have been projected for the coming year.  This acquisition is in line with our strategy to enhance our position in existing categories and channels. We believe this transaction will be accretive in Fiscal 2011 and along with the other exciting programs underway in the mobile sector, should contribute to increased shareholder value.

27.     In March 2011, the Company completed its acquisition of Klipsch Group, Inc. and its worldwide subsidiaries, in the high performance audio solutions space, for a total purchase price of $166 million.  With regard to the acquisition, Defendant Lavelle stated, in pertinent part:

> We are very excited to close this acquisition because it not only adds world-class brands with strong distribution, both domestically and abroad, but it also gives us entre into the high-end installation market at both the residential and commercial level.  In addition to #1 market positions in the U.S., Klipsch brands are recognized throughout EMEA, the Americas, and the Asia-Pacific region, and we plan to continue expansion into other key international markets.  Klipsch R&D capabilities and its quality reputation are second to none, and we intend for that to continue as we welcome the Klipsch team to Audiovox.

28.     In March 2012, the Company completed its acquisition of Hirschmann Car Communication GmbH for a total purchase price of approximately $112 million, plus related transaction fees, expenses and working capital adjustments.  With regard to the acquisition, Defendants stated, in pertinent part:

> This is another major milestone for our Company, as the addition of Hirschmann strengthens our global footprint and our OEM automotive offering.  Hirschmann is a

pioneer in the industry and has been supplying automotive manufacturers for nearly 70 years. Their technology is second to none and we believe, the addition of their antenna solutions and mobile tuners will lead to increased opportunities for our Company.

This acquisition is in line with our stated strategy to increase our global reach, enhance our product offering and expand our OEM automotive business. It also provides us with high quality, manufacturing skillsets which enable us to stay ahead of the technology curve. Hirschmann's relationships with German OEMs are strong and we see additional opportunities to expand their reach into the U.S. and China markets. Additionally, Hirschmann has a substantial base of business already booked for the next few years. We are highly confident that this acquisition will generate new opportunities for growth and profitability as we continue to drive towards generating sustainable returns for our shareholders.

29.     The Class Period commences on May 15, 2013. On May 14, 2013, after the close of the market, VOXX issued a press release announcing its financial results for the fourth quarter and year end of 2013, the period ending February 28, 2013. For the quarter, the Company reported net sales of $206.8 million, gross margin of 29.8%, net income of $10.3 million, and EBITDA of $24.0 million. Defendant Lavelle, commenting on the results, stated, in pertinent part, as follows:

We had one of the most successful years in our Company's history, despite the challenges we and most companies continue to experience given the struggling global markets. While our international operations were impacted, mostly in the Eurozone, domestically, we performed ahead of expectations. The strategy we embarked on is working and ***we are anticipating modest improvements in Fiscal 2014 in our sales, margins, net income and EBITDA***. Moving in to the following year, barring any unforeseen changes, ***we should be even better positioned to grow organically, drive bottom-line performance and generate meaningful returns for our shareholders. I remain very optimistic with our market positions and outlook***.

*            *            *

We're operating lean and we're investing in our infrastructure, which will result in meaningful savings for the Company. ***We've expanded and broadened our retail distribution and believe our commercial business will expand further in Fiscal '14***. While our domestic aftermarket business has declined, primarily due to satellite radio and mobile audio, our OEM business is growing and we were recently awarded several new domestic and international OEM programs, which positions us well for the future. VOXX is a different company – our technical capabilities and resources have never been stronger and with 280 engineers on staff, we are creating technology for the future. ***We still have some near-term headwinds ahead of us in the global***

**markets, but we're well positioned to work through these issues and continue to improve companywide performance**. [Emphasis added.]

30.     On May 15, 2013, the Company held a conference call with analysts and investors.

With regard to the Company's outlook for fiscal 2014, Defendant Lavelle, stated, in pertinent part:

In summary, we did a little over $835 million in sales in fiscal 2013, and we are **estimating approximately $840 million in fiscal 2014.** Automotive will be approximately $413 million; **Premium Audio will be approximately $210 million; and Consumer Accessories will be approximately $216 million.**

We posted EBITDA of $60.4 million, and adjusted EBITDA of $67.5 million. And we generated free cash of $30 million in fiscal 2013. **Our current budget calls for fiscal 2014 EBITDA of $62 million, but better free cash flow of approximately $37 million. And gross margins should come in at 28.8%.** [Emphasis added.]

31.     On the same investor call, Defendant Stoehr stated, in pertinent part:

Lastly, our guidance – Pat [Lavelle] covered sales, gross margin, and EBITDA.  I will add that, one, our overhead will be increasing as we return the salaries to more competitive levels for VP and below, following our cuts in prior years. And we will be investing more in advertising. **Most of the increase in our overhead, however, should be offset by higher gross margins and planned efficiencies.**

EBITDA should increase by more than $1 million, on $5 million on sales, based upon projected mix. If sales come in higher, of course, we will adjust on the upside. But right now, we see domestic offsetting international for the most part. Our cash flow is [approx] to be -- free cash flow is projected to be approximately $37 million in fiscal 2014. **And our CapEx should be somewhere north of $12 million.** [Emphasis added.]

32.     On July 10, 2013, after the markets closed, VOXX issued a press release announcing its financial results for the first quarter of 2014, the period ending May 31, 2013.  For the quarter, the Company reported net sales of $193.0 million, gross margin of 28.2%, net income of $2.1 million, and EBITDA of $9.2 million.  Moreover, the Company reported Automotive sales of $104.9 million, Premium Audio sales of $40.2 million, and Consumer Accessories sales of $47.6 million.  Defendant Lavelle, commenting on the results, stated, in pertinent part, as follows:

Our first quarter results were mostly as expected with sales coming in slightly ahead of projections, despite the small year-over-year decline.  We saw a nice uptick in our gross margins which, as expected, helped offset some of the expense increases we

had previously projected, and most telling, we improved our bottom-line performance. Despite the volatile global markets, we're executing our plan, driving technology, expanding distribution and forming meaningful long-term partnerships with our customers. *I feel confident in our ability to meet the guidance we provided on our fiscal year-end call*.

While we're projecting modest sales increases this year, we believe we will be in a better position to grow organically over the coming years, supported by acquisition and with a better margin structure. Our strategy remains to pay down our debt and aggressively manage our costs, while remaining opportunistic. And this team remains focused on improving cash flow, profitability and shareholder value. [Emphasis added.]

33.     On July 11, 2013, the Company held a conference call with analysts and investors. With regard to the Company's outlook for fiscal 2014, Defendants reiterated the guidance provided on May 15, 2013. Defendant Lavelle stated, in pertinent part:

Turning to Premium Audio, we reported sales of $40.2 million, an increase of 1.7%, *with the bigger gains coming at Klipsch*. Domestically, we continue to grow our business in the sound bar and newly introduced Klipsch Music Center categories, adding distribution, new accounts, and new SKUs. As I mentioned last quarter, we're expecting close to a 9% growth in the Premium audio segment this year, and I believe we are on track to meet that number, based on our first-quarter results.

\*          \*          \*

I believe we continue to position the Company for organic growth over the coming years, potentially supported by some smaller tuck-in acquisitions. Our strategy remains to pay down our debt, aggressively manage our fixed costs, improve margins, and grow both organically and through acquisition. *We are executing that strategy, and I feel comfortable today with the projections I've given and I am reaffirming prior guidance.*

\*          \*          \*

We also are anticipating that we will not see as much of a spike in the fourth quarter, as we believe that Christmas season shaping up and many of our accounts will achieve their VIR numbers and some of the market development funds will be paid out, where in years past we have taken it back as income because they didn't reach their numbers. *So, we're being conservative, but we think that the 28.8% guidance that we've given is going to be accurate*. [Emphasis added.]

34.     In reaction to these announcements, over the next three trading days, the price of VOXX common stock rose $1.80 per share, or 14%, to close at $15.00 per share.

35.     On October 9, 2013, after the markets closed, VOXX issued a press release announcing its financial results for the second quarter of 2014, the period ending August 31, 2013. For the quarter, the Company reported net sales of $183.8 million, gross margin of 29.4%, net income of $4.9 million, and EBITDA of $13.4 million.   Moreover, the Company reported Automotive sales of $99.0 million, Premium Audio sales of $40.8 million, and Consumer Accessories sales of $43.5 million.   Defendant Lavelle, commenting on the results, stated, in pertinent part, as follows:

> ***Our results through the first half of the year are tracking in line with our plan and we are anticipating a strong second half based on several new product launches across all three of our business segments***.   Our Automotive OEM business continues to grow globally and we're positioned well over the coming years, especially with some of our newer technologies such as our smart phone app remote starts, rear-seat entertainment systems, digital TV tuners, 4G and smart antennas, and the new multi-tuner packs and eHub mobile servers that are in development.   In Premium Audio, soundbars, sound bases and music systems should fuel growth in the 2nd half of the year as should some of our newer Consumer Accessories products, such as our Acoustic Research Bluetooth wireless speakers, new line of our RCA charging products and our new headphones under RCA and 808.  While sales are off slightly through the first half of the year, our margins continue to move upwards and we're on track to meet the financial projections we previously disclosed.
>
> We have a lot of activities that should boost sales and increase margins, both near and long-term.  We're generating cash flow and paying down debt and assuming no acquisitions are made in the balance of this fiscal year, we should exit Fiscal 2014 with under $100 million in debt.   We're taking steps to lower our fixed overhead moving into next year and it remains our goal to drive organic growth, improve our margins and cash flow and continue to deliver better bottom-line returns and increased shareholder value. [Emphasis added.]

36.     On October 10, 2013, the Company held a conference call with analysts and investors.  With regard to the Company's outlook for fiscal 2014, Defendants, again, reiterated the guidance provided on the May 15, 2013 investor call.  Defendant Lavelle stated, in pertinent part:

> ***Let me start off by reiterating our prior guidance for the year and reaffirm that through the first two quarters our business is tracking in line with our plan.*** We reported sales of $183.8 million, off $7.9 million or just over 4%.

\*          \*          \*

With the anticipated pickup in the second half of the year, our core business is expected to grow, particularly sales in our automotive OEM customers.  Gross margins were 29.4%, which is 90 basis points ahead of last year's second quarter.  ***Gross margins continue to track in line with our prior guidance of 28.8% with potential upside that will be driven by product mix.***

\*          \*          \*

Last week we reported EBITDA of $13.4 million versus EBITDA of $13.1 million in last year's second quarter, up slightly for the comparable periods.  ***Based on our results and our expectations for the back end of the year, we are comfortable with our EBITDA guidance of $62 million.***  [Emphasis added.]

37.     On the same call, with respect to fiscal 2014 guidance, Defendant Stoehr stated, in pertinent part:

For the three-month period, net sales were $183.8 million, a decline of 4.1%, and for the six-month period, net sales were $376.8 million, a decline of 2.3%.  ***While sales were down, this was anticipated, and we are comfortable with our prior guidance.***

\*          \*          \*

***We are comfortable with our guidance of gross margins of 28.8% for the fiscal year, and we foresee modest upside.***

\*          \*          \*

***As we have indicated, we are reiterating our EBITDA guidance of $62 million.***  [Emphasis added.]

38.     The statements referenced above in ¶¶29-33 and 35-37 were each materially false and misleading when made because they misrepresented or failed to disclose the following adverse facts, which were known to Defendants or recklessly disregarded by them:

(a)     that the Company was experiencing declining headphone sales in its Premium Audio segment;

(b)     that the Company was experiencing a greater than expected sales decline in its Consumer Accessories segment;

- 13 -

(c)    that the Company failed to timely record losses for its Hirschmann, Invision and Klipsch acquisitions, trademarks of various brands, and its Technuity business, among other things, thereby materially overstating the Company's financial condition and misstating the Company's financial results and financial statements; and

(d)    as a result of the foregoing, Defendants lacked a reasonable basis for their positive statements about the Company's financial performance and outlook during the Class Period.

39.    On January 8, 2014, after the markets closed, VOXX issued a press release announcing its financial results for the third quarter of 2014, the period ending November 30, 2013. For the quarter, the Company reported net sales of $245.8 million, gross margin of 28.0%, net income of $15.4 million, and EBITDA of $27.7 million.  Moreover, the Company reported Automotive sales of $121.0 million, Premium Audio sales of $65.6 million, and Consumer Accessories sales of $58.8 million.  Defendant Lavelle, commenting on the results, stated, in pertinent part, as follows:

> Our results in the third quarter and through the first nine months of the year are tracking in line with our plan and we continue to make progress in executing our strategy. ***While we lowered sales guidance slightly, we have done so due to higher exited product category sales and a strategic decision to transition away from some online business to protect future margins***.  All in all, everything is materializing as expected.  The markets are improving modestly, we're strengthening relationships with customers, and we're expanding our global distribution.  The new products and programs we introduced at CES have been met with a lot of enthusiasm and I remain confident that we will be able to generate organic growth as we move into our next fiscal year. ***Additionally, as a result of other income recorded this past quarter, we are raising our EBITDA guidance to $65 million and believe free cash flow will improve to $40 million.***
>
> In the U.S., retail sell-in was strong and we had a number of product load-ins prior to the Holiday selling season in our Premium Audio and Consumer Accessories segments.  Reports on holiday spending thus far have been mixed, with growth in smartphones and tablets continuing to drive industry sales.  We're not expecting a robust spending environment based on sell-thru, though we do see a stable U.S. consumer market, with increased demand for automotive products.  Internationally, the markets have stabilized and we're hopeful that we'll see modest improvements throughout the Eurozone over the coming year.  I believe we're positioned to grow

our business organically, especially as we're almost done exiting certain lower-margin product categories and given that some of our newer products and categories are performing well, including soundbars, music systems, Bluetooth wireless speakers and a host of our automotive solutions.  As such, we believe we're in a better position to exceed both our top and bottom-line performance in FY15.

We're generating good cash flow and paying down our debt.  Our strategy remains to be opportunistic in the M&A environment and barring acquisitions; we expect to have debt under $100 million by the end of our Fiscal year.  Things are shaping up as planned and we look forward to finishing out our Fiscal year as we work towards increasing shareholder value, both near- and long-term. [Emphasis added.]

40.     On January 9, 2014, the Company held a conference call with analysts and investors.

With regard to the Company's outlook for fiscal 2014, Defendants revised the guidance provided on

May 15, 2013, which was reiterated on July 11, 2013 and October 10, 2013.  Sales guidance was

lowered from $840 million to $825-$830 million.  EBITDA guidance was raised from $62 million to

$65 million.  Free cash flow guidance was raised from $37 million to $40 million.  Finally, gross

margin guidance was reiterated.  Defendant Lavelle stated, in pertinent part:

I know that's a lot of information, but there are a lot of exciting new products that we have unveiled at the show. ***To sum it up, for the most part we've been tracking to plan.  And I remain bullish with our prospects over the next several years.***

I think we're in a position now, with much of our transformational programs complete, to grow our core business and while making the right tactical acquisitions that will extend our market penetration across any and all of our three business segments.  ***For fiscal year 2014, we see sales being a bit lower than initially projected, in the $825 million to $830 million range.***  Not a major shift.

***We believe we will achieve the 28.8% gross profit margin that we previously guided to.***  Our expenses are in line, and we have had an increase in other income that will positively impact net income, EBITDA, and cash flow.  ***As a result, we expect a roughly $3 million improvement in EBITDA versus forecast, now guiding to $65 million; and roughly a $3 million improvement in our free cash flow forecast, now guiding to approximately $40 million.***

We're not in a position today to provide firm guidance on next fiscal year. It's just a bit too early.  But with everything we know and have lined up coming out of the show in terms of new products, customer placings, new programs that we have in development, I see no reason why we can't grow our core business by 3% to 4% in fiscal 2015, and additional growth coming from some of the new categories that we're just introducing at the show.  [Emphasis added.]

- 15 -

41.     In reaction to these announcements, the price of VOXX common stock fell $2.99 per share, or 18%, to close at $14.00 per share, on heavy trading volume.  However, Defendants continued to conceal the true scope and impact of the deterioration in VOXX's business.

42.     On May 14, 2014, after the markets closed, VOXX issued a press release announcing its financial results for the fourth quarter and year end of 2014, the period ending February 28, 2014. For the quarter, the Company reported net sales of $187.1 million, gross margin of 28.3%, a net loss of $49 million, and EBITDA loss of $53.4 million.  Moreover, the Company reported Automotive sales of $93.9 million, Premium Audio sales of $42.7 million, and Consumer Accessories sales of $50.2 million.  For the year, the Company reported net sales of $809.7 million, gross margin of 28.4%, and EBITDA of $54.5 (minus any impairment charges).  As for the fiscal 2014 year-end numbers for each segment, the Company reported Automotive sales of $412.5 million, Premium Audio sales of $189.2 million, and Consumer Accessories sales of $206.3 million.  The Company also reported an impairment charge of $57.6 million.  With regard to the impairment charge, Defendants stated, in pertinent part, as follows:

> The Company conducted its annual assessment of its goodwill and intangible assets as of February 28, 2014.  In accordance with ASC350, the goodwill of Hirschmann, Invision and Klipsch, the Company's three most recent acquisitions, were tested for impairment.  As a result of these analyses, an impairment charge of $32.2 million was recorded for goodwill in the Company's Consolidated Statement of Operations and Comprehensive Income (Loss).  Additionally, for intangible assets with indefinite lives, primarily trademarks, the Company compared the fair value of each intangible asset with its carrying amount.  As a result of these analyses, it was determined that the indefinite lived trademarks of various brands and units were impaired, resulting in a total impairment charge of $22.8 million.  Lastly, during the Fiscal 2014 fourth quarter, the Company made a business decision to abandon its Technuity business and restructure the marketing and use of a Company owned domain name, resulting in an impairment charge of $2.6 million.  Together, this resulted in impairment charges of $57.6 million.

43.     Defendant Lavelle, commenting on the results, stated, in pertinent part, as follows:

> Through the first nine months of the year, we were tracking in line with our plan and had very strong load-in's for the holiday season.  While we lowered our top-line

guidance based on softness in December, severe weather conditions throughout the country impacted the entire retail industry and had a big effect on our fourth quarter performance.  Retail was the primary reason for our miss and our story has not changed.  New products coming to market, our growing OEM platform, sales from new and exciting biometrics, imagery and action cameras, and our expanding retail distribution are the drivers for our optimism.  I believe we are well positioned to drive meaningful growth over the next few years and deliver long-term sustainable value for our shareholders.

We took steps in Fiscal '14 to protect margins in certain categories and believe we're well positioned to post modest growth in Fiscal '15, with upside should some of the bigger projects we're pursuing materialize and if the retail environment improves in the next holiday season.  We have accounted for softness in our guidance based on sell-through over the past few years and are managing our overhead accordingly.  We will continue to invest in new growth categories and pursue sponsorships and promotions we believe will increase brand awareness and drive sales.  We have also increased our engineering staff by approximately 10 percent to support new OEM and various programs that will be beginning towards the end of FY15 and run for several years.  We are investing not for the quarter or year, but for our long-term future.

Although the fourth quarter was disappointing, there were a lot of factors beyond our control that impacted sales and profitability.  However, we fully expect to see the market strengthen, our cash flow remains strong and we paid down more debt than initially anticipated.  We have adequate room within our capital structure to continue to support organic growth, investments in new and emerging technologies such as our recently announced investment in EyeSee360, and strategic acquisitions to strengthen any of our three operating segments.  Fiscal '15 should be a better year for us and we are more optimistic about our future prospects.

44.     On May 15, 2014, the Company held a conference call with analysts and investors.

With regard to fiscal 2014 year-end numbers, Defendant Stoehr stated, in pertinent part, as follows:

Now for our financials.  All comparisons are for the fiscal year ended February 28, 2014 and February 28, 2013.  We reported sales of $809.7 million versus $835.6 million, down 3.1%.  Automotive segment sales were $412.5 million, down 1%.

Both our domestic and international OEM business continues to grow.  Domestic OEM sales were up 2.3%.  Our international business was up 9.7%.  Discounting Venezuela, international OEM sales were up 15.4%.

Our fulfillment business, primarily satellite radio, had the biggest impact on our year-over-year comparisons, as fulfillment sales were down almost $17 million.  When taking into account Venezuela and fulfillment sales, our other automotive business was up 5.8%.  During the fourth quarter, automotive sales declined both on the OEM

level and in the aftermarket, as we had to contend with the retail environment and one of our largest OEM customers sold fewer vehicles which impact results.

Premium auto sales were $189.2 million, down 2%. Our domestic business was down 3.7%, though we did see growth from new product such as sound bars, Bluetooth and wireless speakers and new cinema products. International sales were up 1% with the first half of the year soft followed by a much stronger second half.

For the fourth quarter, sales were impacted again due to a soft retail environment and lower headphone sales. We also moved out of older products to make way for our new higher margin product introductions this year.

Consumer accessory sales were $206.3 million, a decline of $18.4 million or 8.2%. This is primarily a result of: a $15 million of exited products; the retail environment in the fourth quarter; and lower international sales, part of which was due to the fact that we did not anniversary set-top box sales from the prior year. As Pat noted in his remarks, we're just about done exiting categories that have had a large impact on our year-over-year results.

Turning to gross margins, our gross margins were 28.4% versus 28.3% for the comparable quarters, a 10 basis point increase. We began the year with a target of 28.8%. We're tracking to that number for most of the year.

*       *       *

Moving on to EBITDA, with the impairment charges, we reported an EBITDA loss of $3.1 million. Without the impairment charges, EBITDA was $54.5 million. This compares to EBITDA of $60.4 million in FY13.

45.     In reaction to these announcements, the price of VOXX common stock fell $2.56 per share, or 25%, to close at $7.51 per share, on heavy trading volume.

46.     The market for VOXX common stock was open, well-developed and efficient at all relevant times. As a result of these materially false and misleading statements and failures to disclose, VOXX common stock traded at artificially inflated prices during the Class Period. Plaintiff and other members of the Class purchased VOXX common stock relying upon the integrity of the market price of VOXX common stock and market information relating to VOXX, and have been damaged thereby.

47.     During the Class Period, Defendants materially misled the investing public, thereby inflating the price of VOXX common stock, by publicly issuing false and misleading statements and omitting to disclose material facts necessary to make Defendants' statements, as set forth herein, not false and misleading.  Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as alleged herein.

48.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused, or were a substantial contributing cause of, the damages sustained by Plaintiff and other members of the Class.  As described herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about VOXX's business, products and operations.  These material misstatements and omissions had the cause and effect of creating in the market an unrealistically positive assessment of VOXX and its business, products and operations, thus causing the Company's common stock to be overvalued and artificially inflated at all relevant times.  Defendants' materially false and misleading statements during the Class Period resulted in Plaintiff and other members of the Class purchasing the Company's common stock at artificially inflated prices, thus causing the damages complained of herein.

**Additional Scienter Allegations**

49.     As alleged herein, Defendants acted with scienter in that Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, Defendants, by virtue of their receipt of

- 19 -

information reflecting the true facts regarding VOXX, their control over, and/or receipt and/or modification of VOXX's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning VOXX, participated in the fraudulent scheme alleged herein.

50.     Defendants were further motivated to engage in this fraudulent course of conduct in order to enable certain Company insiders to collectively sell 594,954 shares of their personally-held VOXX common stock for gross proceeds in excess of $7.5 million:

| Insider | Title | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| Philip Christopher | Director | 6/25/2013 | 25,000 | $12.00 | $300,000 |
| | | 6/12/2013 | 25,000 | $14.00 | $350,000 |
| | | 7/18/2013 | 13,500 | $14.33 | $193,455 |
| | | 8/6/2013 | 2,200 | $14.15 | $31,130 |
| | | 8/13/2013 | 2,985 | $13.51 | $40,327 |
| | | 8/14/2013 | 14,815 | $13.45 | $199,262 |
| | | 10/30/2013 | 2,331 | $16.00 | $37,296 |
| | | 11/4/2013 | 22,669 | $16.00 | $362,704 |
| | | 11/29/2013 | 8,354 | $18.00 | $150,372 |
| | | | **116,854** | | **$1,664,546** |
| Frederick L. Farrar | Officer | 7/17/2013 | 7,000 | $14.40 | $100,800 |
| | | 10/28/2013 | 5,000 | $15.42 | $77,100 |
| | | 3/31/2014 | 746 | $13.90 | $10,369 |
| | | 4/1/2014 | 4,254 | $13.92 | $59,216 |
| | | | **17,000** | | **$247,485** |
| | | | | | |
| C. David Geise | Officer | 10/24/2013 | 6,000 | $15.00 | $90,000 |
| | | 1/2/2014 | 12,500 | $16.37 | $204,625 |
| | | | **18,500** | | **$294,625** |
| | | | | | |
| T. Paul Jacobs | Officer | 9/17/2013 | 12,500 | $13.00 | $162,500 |
| | | | | | |
| | | | | | |
| David P. Kelley | Officer | 2/18/2014 | 5,000 | $12.74 | $63,700 |
| | | 2/18/2014 | 5,000 | $12.74 | $63,700 |
| | | | **10,000** | | **$127,400** |
| | | | | | |
| Michael F. Klipsch | Officer | 6/10/2013 | 5,000 | $11.75 | $58,750 |
| | | | | | |

| Insider | Title | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| Paul C. Kreuch Jr. | Director | 11/20/2013 | 1,112 | $14.00 | $15,568 |
| | | 11/23/2013 | 626 | $14.00 | $8,764 |
| | | 10/1/2013 | 3,262 | $13.56 | $44,233 |
| | | 10/24/2013 | 6,000 | $15.00 | $90,000 |
| | | | **11,000** | | **$158,565** |
| | | | | | |
| Patrick M. Lavelle | CEO | 5/15/2013 | 51,331 | $10.46 | $536,922 |
| | | 5/16/2013 | 43,140 | $10.26 | $442,616 |
| | | 7/15/2013 | 650 | $15.00 | $9,750 |
| | | 9/20/2013 | 1,798 | $14.00 | $25,172 |
| | | 9/23/2013 | 834 | $14.00 | $11,676 |
| | | 10/1/2013 | 15,933 | $13.57 | $216,211 |
| | | 10/2/2013 | 5,785 | $13.77 | $79,659 |
| | | 1/7/2014 | 1,401 | $17.01 | $23,831 |
| | | 1/8/2014 | 5,303 | $17.00 | $90,151 |
| | | | **126,175** | | **$1,435,989** |
| | | | | | |
| Peter A. Lesser | Director | 5/15/2013 | 7,500 | $11.00 | $82,500 |
| | | 6/3/2013 | 5,000 | $11.12 | $55,600 |
| | | 9/20/2013 | 6,000 | $14.00 | $84,000 |
| | | | **18,500** | | **$222,100** |
| | | | | | |
| Richard Maddia | Officer | 7/15/2013 | 1,687 | $15.00 | $25,305 |
| | | 9/20/2013 | 1,500 | $14.00 | $21,000 |
| | | 9/23/2013 | 210 | $14.00 | $2,940 |
| | | 10/1/2013 | 1,603 | $13.60 | $21,801 |
| | | 1/7/2014 | 1,550 | $17.01 | $26,366 |
| | | 1/8/2014 | 3,450 | $17.00 | $58,650 |
| | | | **10,000** | | **$156,061** |
| | | | | | |
| Thomas C. Malone | Officer | 5/15/2013 | 11,923 | $11.00 | $131,153 |
| | | 6/25/2013 | 7,500 | $12.00 | $90,000 |
| | | 10/21/2013 | 7,900 | $14.54 | $114,866 |
| | | 10/21/2013 | 5,000 | $14.50 | $72,500 |
| | | | **32,323** | | **$408,519** |
| | | | | | |
| Dennis F. McManus | Director | 6/25/2013 | 5,000 | $12.00 | $60,000 |
| | | 7/22/2013 | 6,000 | $14.16 | $84,960 |
| | | | **11,000** | | **$144,960** |
| | | | | | |
| John J. Shalam | Director | 5/30/2013 | 14,200 | $11.52 | $163,584 |
| | | 6/3/2013 | 19,100 | $11.12 | $212,392 |
| | | 6/4/2013 | 14,100 | $11.24 | $158,484 |
| | | 6/5/2013 | 14,400 | $10.98 | $158,112 |

| Insider | Title | Date | Shares Sold | Price | Proceeds |
|---|---|---|---|---|---|
| | | 6/6/2013 | 19,800 | $10.89 | $215,622 |
| | | 6/7/2013 | 16,000 | $11.21 | $179,360 |
| | | 6/10/2013 | 9,900 | $11.73 | $116,127 |
| | | 9/20/2013 | 8,200 | $14.00 | $114,800 |
| | | 9/23/2013 | 5,000 | $14.00 | $70,000 |
| | | 9/25/2013 | 100 | $14.00 | $1,400 |
| | | 10/1/2013 | 5,539 | $13.58 | $75,220 |
| | | | **126,339** | | **$1,465,101** |
| | | | | | |
| Loriann Shelton | Officer | 5/15/2013 | 1,427 | $10.90 | $15,554 |
| | | 9/20/2013 | 1,700 | $14.00 | $23,800 |
| | | 9/23/2013 | 940 | $14.00 | $13,160 |
| | | 10/1/2013 | 9,860 | $13.55 | $133,603 |
| | | 1/7/2014 | 1,659 | $17.01 | $28,220 |
| | | 1/8/2014 | 5,333 | $17.01 | $90,714 |
| | | | **20,919** | | **$305,051** |
| | | | | | |
| Charles M. Stoehr | CFO | 5/15/2013 | 38,444 | $10.43 | $400,971 |
| | | 7/15/2013 | 70 | $15.00 | $1,050 |
| | | 9/20/2013 | 1,200 | $14.00 | $16,800 |
| | | 9/23/2013 | 1,012 | $14.00 | $14,168 |
| | | 10/1/2013 | 10,218 | $13.55 | $138,454 |
| | | 10/4/2013 | 1,300 | $14.00 | $18,200 |
| | | 10/9/2013 | 6,600 | $14.00 | $92,400 |
| | | | **58,844** | | **$682,043** |
| | | | | | |
| | | **Totals:** | **594,954** | | **$7,533,695** |

## LOSS CAUSATION

51.     During the Class Period, as detailed herein, Defendants engaged in a scheme to deceive the market and a course of conduct that artificially inflated the price of VOXX common stock and operated as a fraud or deceit on Class Period purchasers of VOXX common stock by failing to disclose and misrepresenting the adverse facts detailed herein.  As Defendants' prior misrepresentations and fraudulent conduct were disclosed and became apparent to the market, the price of VOXX common stock declined significantly as the prior artificial inflation came out of the Company's common stock price.

52.     As a result of their purchases of VOXX common stock during the Class Period, Plaintiff and the other Class members suffered economic loss, *i.e.*, damages, under the federal securities laws.  Defendants' false and misleading statements had the intended effect and caused VOXX common stock to trade at artificially inflated levels throughout the Class Period, reaching as high as $17.90 per share on November 27, 2013.

53.     By concealing from investors the adverse facts detailed herein, Defendants presented a misleading picture of VOXX's business, products and operations.  When the truth about the Company was revealed to the market, the price of VOXX common stock fell significantly.  This decline removed the inflation from the price of VOXX common stock, causing real economic loss to investors who had purchased VOXX common stock during the Class Period.

54.     The declines in the price of VOXX common stock after the corrective disclosures came to light were a direct result of the nature and extent of Defendants' fraudulent misrepresentations being revealed to investors and the market.  The timing and magnitude of the price declines in VOXX common stock negates any inference that the loss suffered by Plaintiff and the other Class members was caused by changed market conditions, macroeconomic or industry factors or Company-specific facts unrelated to Defendants' fraudulent conduct.

55.     The economic loss, *i.e.*, damages, suffered by Plaintiff and the other Class members was a direct result of Defendants' fraudulent scheme to artificially inflate the price of VOXX common stock and the subsequent significant decline in the value of VOXX common stock when Defendants' prior misrepresentations and other fraudulent conduct were revealed.

### APPLICABILITY OF PRESUMPTION OF RELIANCE:
### FRAUD ON THE MARKET DOCTRINE

56.     At all relevant times, the market for VOXX common stock was an efficient market for the following reasons, among others:

(a)     VOXX common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient, electronic stock market;

(b)     as a regulated issuer, VOXX filed periodic public reports with the SEC and the NASDAQ;

(c)     VOXX regularly communicated with public investors via established market communication mechanisms, including regular disseminations of press releases on the national circuits of major newswire services and other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     VOXX was followed by securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

57.     As a result of the foregoing, the market for VOXX common stock promptly digested current information regarding VOXX from all publicly available sources and reflected such information in the prices of the common stock.  Under these circumstances, all purchasers of VOXX common stock during the Class Period suffered similar injury through their purchase of VOXX common stock at artificially inflated prices and a presumption of reliance applies.

## COUNT I

**Violation of Section 10(b) of the Exchange Act
and Rule 10b-5 Promulgated Thereunder
Against All Defendants**

58.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

59.     During the Class Period, Defendants disseminated or approved the materially false and misleading statements specified above, which they knew or deliberately disregarded were

misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

60.     Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's common stock during the Class Period.

61.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for VOXX common stock.  Plaintiff and the Class would not have purchased VOXX common stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

62.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of VOXX common stock during the Class Period.

## COUNT II

### Violation of Section 20(a) of the Exchange Act
### Against the Individual Defendants

63.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

64.     The Individual Defendants acted as controlling persons of VOXX within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By reason of their positions as officers and/or directors of VOXX, and their ownership of VOXX stock, the Individual Defendants had the power and authority to cause VOXX to engage in the wrongful conduct complained of herein.

65.     By reason of such conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.     Determining that this action is a proper class action, designating Plaintiff as Lead Plaintiff and certifying Plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

D.     Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED:  July 8, 2014                    ROBBINS GELLER RUDMAN
                                        & DOWD LLP
                                        SAMUEL H. RUDMAN
                                        MARIO ALBA JR.
                                        WILLIAM J. GEDDISH


                                        _____
                                                SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
malba@rgrdlaw.com
wgeddish@rgrdlaw.com

JOHNSON & WEAVER, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY 10016
Telephone:  212/802-1486
212/602-1592 (fax)

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
110 West "A" Street, Suite 750
San Diego, CA 92101
Telephone:  619/230-0063
619/255-1856 (fax)

*Attorneys for Plaintiff*