UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------X
BRIAN FORD, Individually and on
Behalf of All Others Similarly
Situated,

                 Plaintiff,

                                   <ins>MEMORANDUM & ORDER</ins>
     -against-                    14-CV-4183(JS)(AYS)

VOXX INTERNATIONAL CORPORATION,
PATRICK M. LAVELLE and CHARLES
MICHAEL STOEHR,
                 Defendants.
------------------------------------X
APPEARANCES
For Plaintiffs:      Mario Alba, Jr., Esq.
                   Samuel H. Rudman, Esq.
                   Robbins Geller Rudman & Dowd, LLP
                   58 South Service Road, Suite 200
                   Melville, NY 11747

For Defendants:     John A. Neuwirth, Esq.
                   Caroline Jane Hickey, Esq.
                   Weil, Gotshal & Manges
                   767 Fifth Avenue
                   New York, NY 10153

SEYBERT, District Judge:

       Plaintiff Brian Ford commenced this action on July 8,

2014, on behalf of himself and a class of investors (together,

"Plaintiffs"),[1] alleging that defendants VOXX International

Corporation ("VOXX"), Patrick Lavelle ("Mr. Lavelle"), and Charles

Stoehr ("Mr. Stoehr," and collectively "Defendants") engaged in

---

[1] On July 16, 2016 the Asbestos Works Philadelphia Pension Fund,
IBEW Local 98 Pension, and Plumbers Local No. 98 Defined Benefit
Fund were appointed Lead Plaintiffs in this matter. (Docket
Entry 15.)

securities fraud in violation of Section 10(b) and 20(a) of the Securities Exchange Act of 1934 between January 9, 2013 and May 14, 2014 (the "Class Period"). Specifically, Plaintiffs claim that Defendants provided knowingly false or misleading statements about VOXX's financial performance during the Class Period. Pending before the Court is Defendants' motion to dismiss the Second Amended Complaint. (Docket Entry 19.) For the reasons the follow Defendants' motion is GRANTED.

<u>BACKGROUND</u>[2]

VOXX is a leading international manufacturer and distributor of goods in the automotive, premium audio, and consumer accessories industries. (Am. Compl., Docket Entry 18, ¶ 2.) This case focuses on VOXX's premium audio business, which consists mainly of products manufactured by its wholly owned subsidiary, Klipsch Holding LLC ("Klipsch"). (Am. Compl. ¶ 3.) VOXX acquired Klipsch in March 2011 for $166 million. (Am. Compl. ¶ 38.) Klipsch was known for its "high-end, high-margin home audio speaker systems" and provided VOXX with an entry point into the lucrative headphones market. (Am. Compl. ¶ 6.) Plaintiffs claim, however, that Klipsch had a negative growth rate prior to the acquisition and cite to Klipsch's net sales numbers between 2009 and 2010,

---

[2] The following facts are drawn from the Amended Complaint ("Am. Compl.") and are assumed to be true for the purposes of this Memorandum and Order.

which declined from $169.4 million to 162.3 million. (Am. Compl. ¶ 42.)

After VOXX purchased Klipsch, Mr. Lavelle--VOXX's CEO--commented that "Klipsch will stay true to its legacy of high-end, high-performance products, and we have no intention of changing the product development, the quality standards or the materials that go into the manufacturing of the Klipsch products." (Am. Compl. ¶ 39.) In response to a question about Klipsch's competitors, Lavelle stated during the call that Klipsch's market share was generally improving and that there had not been any material change in the competitive dynamics over the last several years. (Am. Compl. ¶ 41.) Following Klipsch's acquisition by VOXX, Klipsch net sales rose to $166.6 million in 2011. (Am. Compl. ¶ 42.)

## I.  Defendants Allegedly False and Misleading Statements During the Class Period

Plaintiffs' allegations regarding Defendants' false statements rely, to a large extent, upon information supplied by a former employee of Klipsch, "FE1." According to the Amended Complaint, FE1 worked at Klipsch from the year 2000 until August 2014, when he was laid off. (Am. Compl. at 3, n.3.) FE1 held "various titles and responsibilities," including the position of "Manager of Training Worldwide/Technical Communication Manager" from 2010 to 2013, and "Marketing Manager, Commercial Audio" from 2013 until he was laid off in 2014. (Am. Compl. at 3, n.3.) The

latter position was created by VOXX to "increase commercial audio sales." (Am. Compl. at 3, n.3.) FE1 principally expresses the following views in the Amended Complaint: (1) "the Company was experiencing declining headphones sales" and "started to lose market share with headphone/earbuds [in 2012]" (Am. Compl. 61(a)); (2) he believed VOXX's products were priced too high relative to the competition and that the Company's advertising partnership with Live Nation Entertainment and its sponsorship of the Klipsch Music Center "did not generate the recognition or increase in sales that Klipsch had hoped" (Am. Compl. ¶ 61(b)) ; and (3) Klipsch's sales were "flat or declining for several years" and it's "sales of home audio speakers had been declining for years" (Am. Compl ¶ 61(c)).

On January 10, 2013, the day after the beginning of the Class Period, VOXX announced that it would change its financial reporting structure and would report financial results from three segments: Automotive, Accessories, and Premium Audio. (Am Compl. ¶ 59.) Addressing VOXX's Premium Audio segment, Mr. Lavelle made the following statement: "[w]e expect to do approximately $200 million in high-end audio this year and we see good opportunities for growth for several of the years to come, especially as market conditions improve[; t]here is a very loyal and growing customer base behind the Klipsch brand." (Am. Compl. ¶ 59.)

In May 2013, VOXX announced the Company's financial results for the fourth quarter of that year. For the year 2013, the Company reported net sales of $835.6 million, with Premium Audio sales of $193 million, gross margin of 28.3%, and earnings before interest, tax, depreciation and amortization ("EBITDA") of $60.4 million. (Am. Compl. ¶ 62.) Out of the $193 million Premium Audio sale figure, $174 million was attributable to Klipsch. (Am Compl. ¶ 65.) The following table shows Klipsch's sales growth rate from 2011 to 2013:

| Fiscal Year Ended | Klipsch Net Sales | Growth Rate |
|---|---|---|
| 2011 | $166.6 million | |
| 2012 | $169.5 million | 1.7% |
| 2013 | $174 million | 2.6% |

(Am. Compl. ¶ 65.) Commenting on VOXX's potential financial performance in the coming year, Mr. Lavelle said "we are estimating approximately $840 million [in net sales] in fiscal 2014," "Premium Audio will be approximately $210 million," and "[o]ur current budget calls for fiscal 2014 EBITDA of $62 million . . . [while] gross margins should come in at 28.8%." (Am. Compl. ¶ 63.) Further Lavelle stated that "[o]verall, we believe our Premium Audio business will be the biggest growth driver in fiscal 2014, with a growth rate of approximately 9%." (Am. Compl. ¶ 64.) Following these announcements the stock price rose 3.1%. (Am. Compl. ¶ 68.)

The Company held a conference call on July 11, 2013, after VOXX filed its Form 10-Q with the SEC one day earlier. During the call, Mr. Lavelle reiterated some of the Company's guidance for 2014, stating that "we reported sales of $40.2 million [in the Premium Audio category], an increase of 1.7%, with the bigger gains coming at Klipsch." Mr. Lavelle went on to say, "as I mentioned last quarter, we are expecting close to a 9% growth in the Premium audio segment this year, and I believe we are on track to meet that number, based on our first-quarter results." (Am. Compl. ¶¶ 72-73.) Mr. Lavelle also specifically explained that the Company was "having a very good year with sound bars" and that the market for headphones was "quite active, and we expect to grow our overall market share within this space." (Am. Compl. ¶ 74.) Following these pronouncements, the stock price rose 14%. (Am. Compl. ¶ 75.)

On September 19, 2013, Mr. Lavelle touted VOXX's Premium capital audio segment at the Imperial Capital Global Opportunities Conference, saying that "[w]ithin our premium audio space, you'll see us introducing new products within sound bars, sound base, music centers, all new categories that are, in my estimation, set to explode." (Am. Compl. ¶ 78.) Mr. Lavelle specifically focused on the growth potential of VOXX's sound bar and headphones. With respect to the headphones, Mr. Lavelle said that "this is an area that has grown nicely over the last three years" and "another big

growth category for us are our headphones[, w]e have the number one rated in the ear headphones in the market." (Am. Compl. ¶¶ 78, 98.) Plaintiffs acknowledge in the Complaint that the broader market for headphones was growing during the Class Period. Specifically, Plaintiffs state that "[i]n 2013, retail sales of headphones rose 16% to $8.4 billion, with 286 million units shipped worldwide" and "headphones sales were expected to reach $11.3 billion in 2018." (Am. Compl. at 2, n.2.)

On October 9, 2013, VOXX issued a press release announcing its financial results for the second quarter of 2014, the period ending on August 31, 2013. The Company reported net sales of $183.8 million, gross margin of 29.4%, and EBITDA of $13.4 million. VOXX reported Premium Audio sales of $40.8 million. (Am. Compl. ¶ 82.) Commenting on the results, Mr. Lavelle stated, "[o]ur results through the first half of the year are tracking in line with our plan and we are anticipating a strong second half based on several new product launches across all three of our business segments." (Am. Compl. ¶ 82.) The next day, Mr. Lavelle reaffirmed the Company's prior 2014 guidance, stating that "[g]ross margins continue to track in line with our prior guidance of 28.8%" and "we are comfortable with our EBITDA guidance of $62 million." (Am. Compl. ¶ 84.)

With respect to the Company's Premium Audio segment, Mr. Lavelle explained that "[w]hile our sales were off in 2Q and are

down 3.8% . . . we still maintain our prior guidance of approximately 9% growth based on the introductions of our new sound bars, sound bases and music centers." (Am. Compl. ¶ 86.) Commenting on the decline in Premium Audio sales, Mr. Stoehr--VOXX's CFO--stated that "[w]hile that category year to date is down, we still anticipate high single digit growth for the year, as we have a host of new products coming to market, very strong third-quarter load-ins and several new promotional campaigns, primarily at Klipsch. (Am. Compl. ¶ 85.) Elaborating on potential growth at Klipsch, Mr. Lavelle emphasized its "recently announced strategic partnership [with] the Kings of Leon's world tour, one of the hottest bands in the world" and "its partnership with Live Nation." (Am. Compl. ¶ 86.) On October 10, 2013, VOXX stock price rose 3.3%, closing at $14.40. (Am. Compl. ¶ 87.)

The Company announced its third-quarter results on January 8, 2014. VOXX reported net sales of $245.8 million, gross margin of 28%, and EBITDA of $27.7 million, with Premium Audio sales totaling $65.6 million. (Am. Compl. ¶ 90.) Mr. Lavelle again stated that the quarter's results were "tracking in line with our plan" and explained that "as a result of other income recorded this past quarter, we are raising our EBITDA guidance to $65 million." (Am. Comp. ¶ 90.) However, VOXX lowered its sales guidance from $840 million to $825-$830 million. (Am. Compl. ¶ 93.) Mr. Lavelle cautioned that the Company "lowered sales

guidance slightly . . . due to higher exited product category sales and a strategic decision to transition away from some online business to protect future margins." (Am. Compl. ¶ 90.) Discussing anticipated holiday sales, Mr. Lavelle explained that "[r]eports on holiday spending thus far have been mixed, with growth in smartphones and tablets continuing to drive industry sales." (Am. Compl. ¶ 90.) On the Premium Audio front, Mr. Lavelle stated that "sales were up 3% for the three months and down less than 1% year to date." (Am. Compl. ¶ 94.) He further commented that "[n]ewer products are selling well, and recent promotions have resulted in greater sales and increased brand awareness." (Am. Compl. ¶ 94.) Following the Company's third-quarter results, VOXX stock price fell 18%, closing at $14 per share on heavy trading volume. (Am. Compl. ¶ 95.)

VOXX announced its fourth-quarter financial results on May 14, 2014. (Am. Compl. ¶ 100.) The Company reported total net sales of $187.1 million, bringing the net sales for the year to $809.7 million, gross margin was 28.4%, and the company suffered a quarterly EBITDA loss of $54.5 million. (Am. Compl. ¶ 100.) Premium Audio sales in the fourth quarter totaled $42.7 million. (Am. Compl. ¶ 100.)

In its Premium Audio segment, VOXX reported $189.2 million in net sales for the year 2014, with $167.5 million attributable to Klipsch. (Am. Compl. ¶ 104.) Thus, net sales at

Klipsch declined by 3.7% in 2014 instead of rising by 9%, as Defendants' predicted. (Am. Compl. ¶ 104). Mr. Lavelle blamed the company's less than stellar financial performance in the fourth quarter on poor retail sales and the weather, explaining that "[r]etail was the primary reason for our miss" and "[s]evere weather conditions throughout the country impacted the entire retail industry and had a big effect on our fourth-quarter performance." (Am. Compl. ¶ 101.) However, Mr. Lavelle reiterated that the company had been "tracking in line with [its] plan" leading into the fourth quarter and "had very strong load-in's for the holiday season." (Am. Compl. ¶ 101.) In reaction to the announcement of the Company's fourth-quarter financial results, VOXX common stock fell $2.56 per share, or 25% to close at $7.51. (Am. Compl. ¶ 107.)

In the fourth quarter, VOXX also reported an impairment charge of $57.6 million. The charge consisted of a write-down in the goodwill value of Klipsch in the amount of $32.2 million, and the impairment of certain trademarks in the amount of $22.8 million, and an additional impairment charge of $2.6 million. (Am. Compl. at 15, n.7.) Plaintiffs claim that Defendants "knowingly or recklessly" delayed in writing down these charges. (Am. Compl. ¶ 45.) Back in January 9, 2013, VOXX reported that its goodwill and trademark assets collectively totaled $294.8 million. (Am. Compl. ¶ 48.) Plaintiffs claim that "it is implausible that

Defendants believed that the Company's goodwill and trademark assets collectively totaled $294.8 million" at that time because "the market valued the entire VOXX enterprise at $158 million" as of November 30, 2012. (Am. Compl. ¶ 53.)

Plaintiffs allege that Defendants made fraudulent statements during the Class Period that inflated VOXX's common stock and allowed Company insiders to sell personal holdings at inflated prices. (Am. Compl. ¶¶ 100-12.) Pending before the Court is Defendants' motion to dismiss the Amended Complaint. Defendants principally argue that (1) the Amended Complaint must be dismissed because it fails to allege that Defendants made any false or misleading statements, and (2) Plaintiffs failed to plead actionable misleading statements of opinion regarding VOXX's impairment charge.[3] (Defs.' Br., Docket Entry 20, at 8, 12.)

<u>DISCUSSION</u>

I.   <u>Legal Standard under Rule 12(b)(6)</u>

In deciding a Rule 12(b)(6) motion to dismiss, the Court applies a "plausibility standard," which is guided by "[t]wo working principles." <u>Ashcroft v. Iqbal</u>, 556 U.S. 662, 678, 129 S. Ct. 1937, 1949, 173 L. Ed. 2d 868 (2009); <u>Harris v. Mills</u>, 572 F.3d 66, 71-72 (2d Cir. 2009). <u>First</u>, although the Court must accept all allegations as true, this "tenet" is "inapplicable to

---

[3] Although Defendants make a number of additional arguments, the Court need not address them in the Memorandum & Order.

legal conclusions;" thus, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Iqbal, 556 U.S. at 678, 129 S. Ct. at 1949-50; Harris, 572 F.3d at 72. Second, only complaints that state a "plausible claim for relief" can survive a Rule 12(b)(6) motion to dismiss. Iqbal, 556 U.S. at 679, 129 S. Ct. at 1950. Determining whether a complaint does so is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Id.; Harris, 572 F.3d at 72.

In deciding a motion to dismiss, the Court is confined to "the allegations contained within the four corners of [the] complaint." Pani v. Empire Blue Cross Blue Shield, 152 F. 3d 67, 71 (2d Cir. 1998). However, this limitation has been interpreted broadly to include any document attached to the complaint, any statements or documents incorporated in the complaint by reference, any document on which the complaint heavily relies, and anything of which judicial notice may be taken. See Chambers v. Time Warner, Inc., 282 F.3d 147, 152-53 (2d Cir. 2002) (citations omitted); Kramer v. Time Warner Inc., 937 F.2d 767, 773 (2d Cir. 1991).

II. Section 10(b) and Rule 10b-5 Claims

Section 10(b) of the Securities and Exchange Act of 1934, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, prohibit fraudulent activities undertaken in connection with securities

transactions.  See Novak v. Kasaks, 216 F.3d 300, 305 (2d Cir. 2000).  "To state a claim under Section 10(b) and Rule 10b-5, plaintiffs must allege that [Defendants] '(1) made misstatements or omissions of material fact; (2) with scienter; (3) in connection with the purchase or sale of securities; (4) upon which plaintiffs relied; and (5) that plaintiffs' reliance was the proximate cause of their injury.'"  Lattanzio v. Deloitte & Touche LLP, 476 F.3d 147, 153 (2d Cir. 2007) (quoting In re IBM Sec. Litig., 163 F.3d 102, 106 (2d Cir. 1998)).

To survive a motion to dismiss an action alleging securities fraud, Plaintiffs must also satisfy the heightened pleading standards of both Rule 9(b) of the Federal rules of Civil Procedure and the Private Securities Litigation Perform Act of 1995 (the "PSLRA").  To comply with 9(b), "the complaint must: (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Lerner v. Fleet Bank N.A., 459 F.3d 273, 290 (2d Cir. 2006) (internal quotation marks and citation omitted).  In addition, the PSLRA requires that a securities fraud complaint, "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

III. <u>False Information Supplied by Plaintiffs' Confidential Witness</u>

Defendants argue that Plaintiffs' Amended Complaint must be dismissed because it does not adequately allege that Defendants statements were false, as required by Rule 9(b). (Defs.' Br. at 8.) Defendants point to the allegations levied by Plaintiffs' sole confidential witness, who supplied nearly all of the material information that Defendants allegedly misrepresented or failed to disclose in connection with their public statements about the Company's financial performance. (Defs.' Br. at 8.)

It is common in securities fraud actions for plaintiffs to rely upon information supplied by confidential sources in the complaint. <u>See, e.g.</u>, <u>Emps.' Ret. Sys. of Gov't of the V.I. v. Blanford</u>, 794 F.3d 297, 305 (2d Cir. 2015). Although Plaintiffs need not name their witnesses, to properly rely upon information they supply in the complaint, the sources must be described "with sufficient particularity to support the probability that a person in the position occupied by the source would possess the information alleged." <u>Novak</u>, 216 F.3d at 314. In addition, to the extent a complaint relies upon confidential witnesses to show that company insiders made fraudulent public statements, the information must be alleged with sufficient particularity to demonstrate that the insiders' statements were actually false. <u>See</u> F<span style="font-variant:small-caps">ED</span>. R. C<span style="font-variant:small-caps">IV</span>. P. 9(b); <u>Cf.</u> <u>In re Scottish Re Grp. Sec. Litig.</u>,

524 F. Supp. 2d 370, 391–93 (S.D.N.Y. 2007) (plaintiffs properly alleged that defendants made misleading statements about their company's internal controls based upon information supplied by four confidential witness placed in different parts of the company). Thus, courts have dismissed securities fraud claims that are solely based upon vague allegations supplied by confidential sources. For example, in City of Roseville Employees' Retirement System v. Energysolutions, Inc., 814 F. Supp. 2d 395, 413 (S.D.N.Y. 2011), plaintiffs claimed that statements made in a company's registration statement falsely overstated the value of a trust fund. The allegations were based on information supplied by a confidential witness, who stated that the "value in the trust fund had declined by May 2008, and that the trust fund had declined to $727 million by November 2008." Id. Dismissing the plaintiffs' allegations, the court found the information supplied by the confidential witness to be overly vague because the witness did not provide any information about the period over which the balance declined, the amount of the decline, or the accuracy of the statements in the registration statement. Id. at 414. In addition, the confidential witness's allegations were not directly contradicted by the information in the registration statement. Id.; see also Caiafa v. Sea Containers Ltd., 525 F. Supp. 2d 398, 411 (S.D.N.Y. 2007) (finding that allegations from a confidential witness regarding the fraudulent overvaluation of shipping

containers were inadequate because, <u>inter alia</u>, the witness failed to "specify the amount by which the containers were overvalued, and at what times").

In this case, nearly all of the information Defendants allegedly failed to disclose in their public statements is derived from information provided by a single confidential witness, FE1, a former employee of VOXX. (<u>See</u> Am. Compl. at 3.) According to the Amended Complaint, FE1 worked at VOXX from the year 2000 until August 2014, and held "various titles and responsibilities," including the position of "Manager of Training Worldwide/Technical Communication Manager" from 2010 to 2013, and "Marketing Manager, Commercial Audio" from 2013 until he was laid off in 2014. (Am. Compl. at 3, n.3.) The latter position was created by VOXX to "increase commercial audio sales." (Am. Compl., n.3.) Throughout the Amended Complaint, FE1 provides three key pieces of information that Defendants failed to disclose, allegedly rendering Defendants' public statements materially false or misleading. Specifically, FE1 claims in the Amended complaint that: (1) "the Company was experiencing declining headphones sales" and "started to lose market share with headphone/earbuds [in 2012]" (Am. Compl. ¶ 61(a)); (2) he believed VOXX's products were priced too high relative to the competition and that the Company's partnership with Live Nation Entertainment and its sponsorship of the Klipsch Music Center "did not generate the recognition or increase in sales

16

that Klipsch had hoped" (Am. Comp. ¶ 61(b)); and (3) Klipsch's sales were "flat or declining for several years" and it's "sales of home audio speakers had been declining for years" (Am. Compl. ¶ 61(c)).

Although FE1 is described in the Amended Complaint with sufficient particularity to credit any factual information disclosed about VOXX's marketing efforts, the Court finds that the statements and opinions attributed to him are too vague to form the basis of a fraud claim. First, FE1's statements that Klipsch's sales were "flat or declining for years" does not provide enough detail to render any of Defendants' public statements false. Klipsch net sales figures during the Class Period were publicly disclosed and Plaintiffs provide no reason to believe that those figures were incorrectly stated. Fried v. Lehman Bros. Real Estate Assocs. III, L.P., No. 09-CV-9100, 2011 WL 1345097, at *10 (S.D.N.Y. Mar. 29, 2011), aff'd, 506 F. App'x 5 (2d Cir. 2012) ("Where, as here, the allegedly omitted statements were actually disclosed, the § 10(b) claim fails."). In fact, Plaintiffs rely upon Klipsch's reported sales figures as evidence in the Amended Complaint. (See, e.g., Am. Compl. ¶¶ 42, 65.) In addition, FE1's claims that "sales of home audio speakers had been declining for years" and the Company was "experiencing declining headphone sales" are overly vague because there is no indication of the time period to which the statements refer, the magnitude of the alleged

decline in sales, or the extent to which the decline impacted the Company's reported sales figures. (Am. Compl. ¶ 61(a), (c).) <u>See</u> <u>Caiafa</u>, 525 F. Supp. 2d at 411; <u>In re MSC Indus. Direct Co., Inc.</u>, 283 F. Supp. 2d 838, 846 (E.D.N.Y. 2003) (finding that the plaintiffs failed to state fraud with particularity when the complaint did not set forth the "amounts at which the alleged improper write-downs . . . or the other alleged reserve manipulation caused" a company's earnings to be overstated); <u>Grandon v. Merrill Lynch & Co., Inc.</u>, 147 F.3d 184, 193–94 (2d Cir. 1998) ("A plaintiff's conclusory allegation that markups are excessive is similar to a barroom generality; it is insufficient to state a securities fraud claim."). Moreover, the Amended Complaint provides no facts to support the conclusion that FE1 had any access to the Company's financial records or access to individuals with knowledge of the Company's Premium Audio sales figures. <u>See</u> <u>In re MSC Indus. Direct Co., Inc.</u>, 283 F. Supp. 2d 838, 847 (E.D.N.Y. 2003)

For similar reasons, FE1's opinions that (1) VOXX's products were too expensive relative to the competition, and (2) that its advertising campaigns "did not generate the recognition or increase in sales that Klipsch had hoped" cannot, without more detail, support a fraud claim. (Am. Compl. ¶ 61(b).) As a general matter, the "mere opinions of confidential witnesses . . . are not actionable" in securities fraud cases. <u>Kemp v. Universal Am. Fin.</u>

18

Corp., No. 05-CV-9883, 2007 WL 86942, at *13 (S.D.N.Y. Jan. 10, 2007). Here, FE1's opinions about the price point of VOXX Premium Audio products and the effectiveness of its advertising campaigns, untethered to any particular facts about how VOXX's pricing and advertising actually affected sales, lacks the particularity necessary to allege that Defendants' public statements about the Company's Premium Audio business were false. See City of Dearborn Heights Act 345 Police & Fire R v. Axonyx, Inc., 374 F. App'x 83, 85 (2d Cir. 2010) (explaining that "appellants rel[ied] on opinions of confidential witnesses to support their allegations, but they failed to offer any factual underpinnings for those opinions").

The only information supplied by FE1 that raises a concern is his statements that the Company "started to lose market share with headphone/earbuds [in 2012]." (Am. Compl. ¶ 61(a).) As a manager in charge of marketing Premium Audio merchandise at VOXX, FE1 was plausibly in a position to know the Company's standing in the market for headphones relative to competitors. See Blanford, 794 F.3d at 301. Moreover, Defendants made a number of statements touting the Company's past and anticipated growth in the market for headphones as a basis for its 2014 financial guidance, including statements, like "another big growth category for us are our headphones[, w]e have the number one rated in the ear headphones in the market" and "this is an area that has grown nicely over the last three years." (Am. Compl. ¶¶ 78, 98.)

However, FE1's market share claims also are too vague to support a cause of action under Rule 9(b). Plaintiffs acknowledge in the Complaint that the broader market for headphones was growing during the Class Period. Specifically, Plaintiffs state that "[i]n 2013, retail sales of headphones rose 16% to $8.4 billion, with 286 million units shipped worldwide" and "headphones sales were expected to reach $11.3 billion in 2018." (Am. Compl. at 2, n.2.) Although FE1 claims that the Company began losing market share in 2012, the Amended Complaint provides no information about whether VOXX's position in the market changed during the Class Period or to what extent its reported sales figures during the Class Period were impacted by its market position. Moreover, as previously discussed, FE1's conclusory assertion that VOXX "was experiencing declining headphone sales," (Am. Compl. ¶ 61(a)) without more information about the timing and magnitude of the decline is insufficient to cure Plaintiffs' claims based upon VOXX's position in the headphones market.

Plaintiffs place great weight upon Defendants' 2014 financial guidance as a basis for their securities fraud allegations. (Pl.'s Opp. Br., Docket Entry 22, at 2.) And indeed, "'[s]tatements regarding projections of future performance may be actionable under Section 10(b) or Rule 10b-5 if . . . the speaker does not genuinely or reasonably believe them.'" In re Nortel Networks Corp. Sec. Litig., 238 F. Supp. 2d 613, 627 (S.D.N.Y.

2003) (quoting In re Int'l Bus. Machines Corp. Sec. Litig., 163
F.3d 102, 107 (2d Cir. 1998)).  Plaintiffs correctly point out
that Defendants' estimated 9% growth rate was lofty in light of
Klipsch's 1.7% growth rate in 2012 and 2.6% growth rate in 2013.
However, Klipsch's past performance was publicly known at the time
Defendants issued their 2014 financial guidance.  To allege fraud,
Plaintiffs must do more than merely claim Plaintiff's financial
estimates were unreasonable in light of publicly available
information.  Rather, Plaintiff must set forth specific facts
showing why Defendants' fiscal guidance was false or misleading,
and not merely ambitious.  "[C]onclusory allegations that
defendant's conduct was fraudulent or deceptive are not enough.").
Decker v. Massey-Ferguson, Ltd., 681 F.2d 111, 114 (2d Cir. 1982)
(citation omitted).  Here, Plaintiffs failed to meet this burden
in the Amended Complaint.

IV.  VOXX's Alleged Fraudulent Statements Concerning its
     Intangible Assets

        Plaintiffs claim that VOXX's disclosures regarding the
value of its goodwill and trademark assets during the Class Period
were materially false or misleading because the reported values
were inflated, and Defendants should have tested these assets for
impairment "no later than third quarter of fiscal 2013."  (Pls.'
Opp. Br., at 14.)  Instead of recognizing an impairment charge in
the third quarter, VOXX reported an impairment charge of $57.6
million in the fourth quarter, consisting primarily of a write-

down in the goodwill value of Klipsch in the amount of $32.2 million, and the impairment of certain trademarks in the amount of $22.9 million. Plaintiffs claim Defendants should have known that its tangible assets were impaired earlier because: (1) on January 9, 2013, the market value of VOXX's entire enterprise was $158 million, but the Company nevertheless reported that its goodwill and trademark assets were worth $294.8 million; (2) VOXX was forced to lower its fiscal guidance in the third quarter of 2013; and (3) FE1 reported that Klipsch was experiencing various problems, as discussed above. (Pls.' Opp. Br. at 14-16.)

A company's goodwill and trademark holdings are both intangible assets that are difficult to value with pinpoint accuracy. See In re Soup Kitchen Int'l Inc., 506 B.R. 29, 41 (Bankr. E.D.N.Y. 2014) (explaining that the valuation of intangible assets is a "complicated issue that is subject to interpretation"); Playboy Enters., Inc. v. Chuckleberry Pub., Inc., 486 F. Supp. 414, 429 (S.D.N.Y. 1980) (discussing the valuation of trademarks assets). In the context of the acquisition of a business, "goodwill is 'an asset representing the future economic benefits arising from other assets acquired in a business combination that are not individually identified and separately recognized.'" Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011) (quoting SFAS No. 141 ¶ 3j). "[F]ollowing an acquisition, goodwill is measured as any excess of the purchase

price over the value of the assets acquired and liabilities assumed. Id. at 108, n.1. Under generally accepted accounting principles ("GAAP")[4], companies are required to test the goodwill value they report on an annual basis, and sometimes more frequently. Id. More specifically, under GAAP, "[g]oodwill of a reporting unit shall be tested for impairment between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its [reported] amount." SFAS No. 142 ¶ 28[5]; see Id. at 110. Circumstances that would trigger a company's obligation to test for an impairment prior to the annual test include, for example, "[a] significant adverse change in legal factors or in the business climate" or "[u]nanticipated competition." SFAS No. 142 ¶ 28.

The parties both agree that VOXX's statements during the Class Period regarding the value of its intangible assets were statements of opinion, rather than statements of fact. (Defs.' Br. at 15; Pls.' Opp. Br. at 14.) To state a fraud claim based upon a misstatement of opinion following the Supreme Court's recent

---

[4] "'[F]inancial statements filed with the [SEC] which are not prepared in accordance with generally accepted accounting principles will be presumed to be misleading or inaccurate.'" In re Fannie Mae 2008 Sec. Litig., 742 F. Supp. 2d 382, 408–10 (S.D.N.Y. 2010) (quoting 17 C.F.R. § 210.4–01(a)(1)) (second alteration in original); see Ganino v. Citizens Utils. Co., 228 F.3d 154, 160 (2d Cir. 2000) (defining GAAP).

[5] SFAS 142 is available at: http://www.fasb.org/jsp/ FASB/Document_C/DocumentPage?cid=1218820124961&acceptedDisclaimer=true

holding in Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund, 135 S. Ct. 1318, 1332, 191 L. Ed. 2d 253 (2015), Plaintiffs must allege material facts that call the basis for the Company's opinion into question and "whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context." For example, Justice Kagan indicated that "facts about the inquiry the [Defendants] did or did not conduct or the knowledge it did or did not have" could be sufficient to state a claim based upon a misstatement of opinion. Id.

Before the Circuit's decision in Omnicare, the Second Circuit recognized in Fait v. Regions Fin. Corp., 655 F.3d 105, 110 (2d Cir. 2011) that allegations regarding fraudulent misstatements of intangible assets do "not involve misstatements or omissions of material fact," but rather statements of opinion. Similar to Justice Kagan's holding in Omnicare, the Second Circuit ruled that to state an actionable claim based upon a misstatement of a company's goodwill assets, the complaint must "plausibly allege that defendants did not believe the statements regarding goodwill at the time they made them." Id. at 112. The Second Circuit's decision one year after Fait in City of Omaha, Neb. Civilian Emps.' Ret. Sys. v. CBS Corp., 679 F.3d 64, 66 (2d Cir. 2012) is instructive in this case. There, the plaintiffs claimed CBS and various insiders made fraudulent statements in their

corporate filings after they incurred a multimillion dollar impairment charge to the company's goodwill assets. Plaintiffs claimed that various publicly-known "red flags," should have caused the defendants to perform an impairment test four months earlier. Id. at 69. These red flags included (1) the widening gap between CBS's book value and its market capitalization, (2) the decline in CBS's advertising revenue, and (3) analysts' negative outlook on the advertising market. Id. at 69. Following the precedent set by Fait, the Court held that the plaintiffs failed to state a claim because they did not plead any facts which "plausibly demonstrate[d] that defendants knew, nor even had reason to know . . . it was more likely than not that the goodwill of any specific reporting unit was overvalued." Id. at 68.

Plaintiffs' Amended Complaint in this case falls short of what is needed to plead an actionable misstatement of opinion. Similar to the complaint in CBS, Plaintiffs' Amended Complaint does not contain facts suggesting that Defendants knew at any point during the Class Period that VOXX's goodwill or trademark assets were inflated and should have been tested for impairment. Moreover, the fact that VOXX lowered its sales guidance in the third quarter of 2013 by $15 million because of lower than expected sales does not implicate the kind of adverse market conditions that should have triggered an impairment test. Cf. Dudley v. Haub, No. 11-CV-05196, 2013 WL 1845519, at *11-12 (D.N.J. Apr. 30, 2013)

25

(finding that a supermarket chain should have tested for impairment earlier because, <u>inter alia</u>, the company's former CEO acknowledged the company was operating in "one of the worst environments I have ever experienced in my career in the supermarket industry" and that the company was experiencing "unanticipated price competition"). Similarly, the observation that the reported value of VOXX's intangible assets exceeded its market capitalization is insufficient to show Defendants made an actionable misstatement of opinion absent factual allegations regarding "the inquiry the [Defendants] did or did not conduct or the knowledge it did or did not have." <u>Omnicare</u>, 135 S. Ct. at 1332. Finally, as discussed earlier, the information supplied by FE1 is too vague support Plaintiff's misstatement of opinion claims. Therefore, Plaintiffs' claims regarding the statement Defendants made about VOXX's intangible assets are DISMISSED.

V.   <u>Leave to Amend</u>

       The Second Circuit has stated that "[w]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." <u>Hayden v. Cnty. of Nassau</u>, 180 F.3d 42, 53 (2d Cir. 1999) (<u>citing Ronzani v. Sanofi S.A.</u>, 889 F.2d 195, 198 (2d Cir. 1990)); <u>see also</u> Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). "However, a district court has the discretion to deny leave to amend where there is no indication from a liberal reading of the

complaint that a valid claim might be stated." <u>Perri v. Bloomberg</u>, No. 11-CV-2646, 2012 WL 3307013, at *4 (E.D.N.Y. Aug. 13, 2012) (citing <u>Chavis v. Chappius</u>, 618 F.3d 162, 170 (2d Cir. 2010)). Because the Court finds that the bulk of Plaintiffs' claims must be dismissed due to the vagueness of the allegations, Plaintiffs are granted a final opportunity amend their Complaint.

CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss (Docket Entry 19) is GRANTED and the Amended Complaint is DISMISSED. However, Plaintiffs are granted leave to amend and may file a Second Amended Complaint ("SAC") within sixty (60) days of the date of this Memorandum & Order. If Plaintiffs choose to file an SAC, they are directed to file, as an exhibit to the SAC, a redline comparing the SAC to the Amended Complaint.

SO ORDERED.

/s/ JOANNA SEYBERT_____
Joanna Seybert, U.S.D.J.

Dated:    July 22, 2016
          Central Islip, New York